## BALTIMORE CITY COURT.

Filed April 24, 1928.

GEORGE RAYMOND HILL, INFANT, BY HIS FATHER AND NEXT FRIEND,

VS.

THE EVENING NEWS COMPANY.

*Charles T. Leviness* of counsel for plaintiff.

*L. Vernon Miller* and *B. Boyd Graham* of counsel for defendant.

STEIN, J.—

In this case, defendant's motion of ne recipiatur raises two questions; that of the defendant's liability, which depends upon whether or not this suit abated on the death of the infant plaintiff before judgment, and that of parties.

The record shows: That on March 19, 1927, George Raymond Hill, the infant plaintiff, by his father and next friend, brought this suit against the defendant, a corporation, to recover damages for publishing an alleged libel; the defendant was summoned, plead the general issue, and issue was joined. On October 10, 1927, before trial and judgment, the father filed a written suggestion of the son's death intestate; stated, that letters of administration had not been granted; asked that he, the father, "as personal representative," and "as successor in title," be admitted to prosecute this suit; which did not abate on his son's death; the defendant filed a motion of ne recipiatur to this suggestion; because the suit abated at the son's death; and if it did not abate, the father was not a proper party plaintiff.

If the action survives, it can only be continued by an administrator of the son, duly appointed and qualified; as the father is not such administrator, the motion of ne recipiatur must be granted. If the suit abated at the son's death, his administrator when appointed and qualified cannot continue it; so that the real question is, did the suit abate?

Counsel orally argued this question with unusual force; in their supporting briefs displayed learning and ability of very high order.

Plaintiff's counsel contended: That the Common Law Rule, that personal actions "die with the person," has been changed in Maryland by the Abatement Statutes, so that, save in a few instances, they do not abate at the death of the sole plaintiff before judgment; may be continued by the executor or administrator of the decedent; that while actions of slander abate, actions of libel do not, and may be continued by the decedent's executor or administrator.

Defendant's counsel admit that actions of slander are excepted from the provisions of the Abatement Statutes, and are governed by the Common Law Rule, and "die with the person"; say that in these statutes the word slander is used in its then common meaning of defamation and so included libel; that it was not until long after the passage of these statutes—and in modern times that in legal language the word slander is used to mean oral defamation, so as to distinguish it from all other kinds of defamation, for which the word libel is commonly used.

The Common Law Rule of "actio personalis moriatur cum persona," was in force in Maryland, until changed by the first Abatement Statute, i. e., the Act of 1785, Chapter 80, Sec. 1, passed on March 11, 1786, under which:

"*No action* brought or to be brought in any Court of law in this State, shall abate by the death of either of the parties to such action. * * *

"And in case the plaintiff or plaintiffs in the action aforesaid shall die before the same may be tried and judgment given and such death would abate *the action* before this Act, the appearance of the heir, devisee, executor or administrator, as the case may be, may require, or other proper' persons to prosecute such suits shall be admitted to be entered to the same.

"* * * And all cases of death of the plaintiff after the appearance of the *defendant's* heir, devisee, executor or administrator, or other person or defendant as aforesaid * * * shall be taken and considered as within the meaning and provision of this Act."

The next Abatement Statute was the Act of 1798, Ch. 101, sub-chapter VIII, Sec. 5, which took effect on the first day of June, 1799, and restored the Common Law Rule as to actions of slander and actions for injuries or torts done the person, so that:

"Executors and administrators * * * shall have full power and authority to commence and prosecute *any personal action* whatsoever, at law or in equity, as the case may require, which the testator or intestate may have commenced and prosecuted, *except actions of slander* and for injuries done the person."

These statutes are codified in: 2 Bagby's Code, 1924, pp. 2371 and 2905; Art. 75, Sec. 29, and Art. 92, Sec. 106, p. 2905; and so far as pertinent here, are as follows, viz:

Art. 75, Sec. 29, pp. 2371-2372:

"No action of ejectment, waste, partition, dower, replevin or *any personal* action * * * including appeals from judgments rendered by Justices of the Peace in any Court of law in this State shall abate by the death of either or any of the parties to such action * * * This not to apply to actions for injuries to the person where the defendant dies, *not to* actions for slander."

Art. 92, Sec. 106, p. 2905, is as follows:

"Executors and administrators shall have full power to commence and prosecute *any personal action* whatever, at law or in equity, which the testator or intestate may not have commenced and prosecuted, *except actions of slander;* and they shall be liable to be sued in any Court of law or equity in any actions (except for slander and injuries to the person)."

The defendant's liability in this case depends upon the meaning of the word slander in the Acts of 1786 and 1798, supra; that meaning is to be found in the ancient authorities in force when these Acts were passed.

They show that then slander was used by judges and law writers to mean all kinds of defamation. Later authorities show that the use of the word slander meant oral defamation only, so as to distinguish it from libel, which included all other kinds—was of a much later and modern development.

This is shown in Johnson vs. Haldeman, 102 Ky. 163. Burnam, J.—"The only question in this case is whether an action for libel survives the death of the plaintiff. Appellees were sued by Andrew Johnson for publishing an allegel libel against him. Before trial, he died, and his administratrix moved the Court to revive the action in her name. This the Court refused to do, holding that the action was embraced by the provisions of Section 10 of the Kentucky Statutes, under the word 'slander.' By that section, actions for slander do not survive. As libel is not named in that section, the question is, does the word 'slander' embrace libel? The word 'slander' is the general and original word for all kinds of defamation. One can be defamed by words spoken, words written, or by signs or pictures, and, when so defamed, it is called slander; and the word 'slander,' in the statute, we think, was intended to embrace all these varieties of defamation. There is nothing in the statute which shows that the word was intended to be limited in its meaning to oral slander. Webster defines 'slander' as defamation generally, whether oral or written, but goes on to say that in modern usage it has been limited to defamation by words spoken. Bac. Abr., says: 'Slander is the publishing of words, in writing or by speaking, by reason of which the person to whom they relate becomes liable to suffer some corporal punishment.'

Esp. N. P. 496 says in regard to the action of slander: 'Slander is the defaming a man in his reputation, by speaking or writing words from whence any injury in character or property arises, or may arise, to him of whom the words are used, and may be committed: First by words; second, by writing (which is called "libel"); third, by picture, or representation of that sort.' Folkard Starkey says: 'The term "slander" was formerly used to embrace written as well as oral defamation.' 2 Kent Comm. p. 16, draws the distinction between spoken and written slander; treating the word 'slander' as comprehensive enough to embrace both oral and written defamation. It has never been the policy of the law to keep alive death of the plaintiff. For the reasons indicated, the judgment of the lower Court is affirmed."

This question was presented to the Florida Court of Appeals in Jones Verum & Co. vs. Townsend, Admx., 23 Fla. 355. There the intestate sued Jones, Varum & Co. for libel and recovered a judgment. Pending appeal, intestate died. The judgment was reversed; the administratrix representing deceased, thereupon began suit afresh, upon a suggestion of death of the intestate. Judgment was given for plaintiff. On appeal, reversed on the ground that the action of libel did not survive to the personal representatives. (1) The statutes under which the suit was prosecuted read as follows:

"No suit in any of said Courts shall abate by the death of either party where the cause of action would in any case survive to the executor or administrator, but the same shall proceed as if such testator or intestate had not died."

"That hereafter all actions for personal injuries shall die with the person, to wit: Assault and battery, *slander*, false imprisonment and malicious prosecution; all other actions shall and may be maintained in the name of the representative of the deceased."

*The Court said:* "As a rule of exposition, statutes are to be construed in reference to the principles of the common law, for it is not to be presumed that the Legislature intended to make any innovation upon the common law, further than the case absolutely required. The law rather infers that the Act did not intend to make any alteration, other than what

is specified, and *besides* what is plainly pronounced. * * * An action based on a libel or other personal injury not enumerated is as much within the meaning and even the letter of this Act, looking at its context, as one based on slander or other enumerated wrong."

An unusually learned and full discussion of the meaning of the word slander at the time of the passage of the Act of 1798, Chap. 106, supra, is contained in a very able opinion in Rice vs. Simmons, 2 Harr. (Del.) 417, (not at 309), which was an action to recover damages for the publication of a libel. This opinion points out and discusses the dictinction between *verbal* and *written* slander; throughout speaks of verbal and written slander, and of libel as written slander.

The following authorities hold that when the Abatement Statutes, supra, were passed, and for some time thereafter, the word slander was used by judges, lawyers and law writers, to mean all kinds of defamation; and not oral defamation, as distinguished from all other kinds of defamation now covered by the word libel.

6 Bacon's Abridgement, 201.

"Slander is the publishing of words, *in writing*, or *by speaking*, by reason of which the person, to whom they relate, becomes liable to suffer some corporal punishment, or to sustain some damage. * * * *Slander in writing* has at all times and with good reason been punished in a more exemplary manner than slanderous words. * * * Words, which are frequently the effect of a sudden gust of passion, may soon be buried in oblivion, but *slander* which is *committed in writing*, * * * is for the most part so lasting, as to be scarce ever forgiven.

"For *written slander* the party injured may proceed against the author by indictment or information. * * *

"If the *slander be by words spoken*, there is in the general no other remedy than by action upon the case."

Cunningham Law Dictionary, title Action, sub-title VII.

Action on the case for Slander or Defamation, edition March 30, 1764.

"It makes no difference whether the *slander* is *published* in *writing* or *print*, or by *speaking*."

1 Comyn's Digest, folio 368:

"An action on the case lies for defamation. If a man by *letter write*

*slander* of *another* to a third person." 1 And. 119. "If he *insert slander of him in affidavit*, foreign to the matter of the affidavit." Dub. 3 Mod. 103.

Espinasse's Nisi Prius, p. 496, edition of 1794.

"Slander is defaming a man in his reputation by *speaking or writing words* from whence any injury in character or property arises, or may arise to him of whom the words are used, and may be committed, first, by words: second, *by writing (which is called libel)* ; third, by pictures or representation of that sort."

I Starkie on Slander & Libel, title Division of Subject, p. 3, note C.

"The ordinary legal term by which an injury of the above description is directed is slander; but to this term different meanings have been attached. Its origin is the same as that of the word Scandal. * * * There is nothing in the *origin of the term* which should confine its figurative application to oral, as contradistinguished from written communications, although it has frequently been used in the former limited sense." * * *

"But, if not in common acceptation, yet in *legal understanding, at least*, the word Slander is used to embrace written as well as oral defamation."

Hillard on Torts, Vol. 1, p. 241, 4th Ed., 1874, says:

"The first and principal injury to character or reputation is slander or libel, although as will be seen, in some respects governed by different rules, these two wrongs are for the most part considered as substantially one and the same; *slander being an unwritten or unprinted libel*, and *libel a written or printed slander*. They are so far identical as to be most properly treated together." * * *

Holt on the Law of Libel, p. 9, note p.

"Distinction was very early taken in the Roman law between *slander spoken* and *written* and the injuris verbalis was deemed to constitute a much lower degree of injury than the malum carmen and famousus libellus."

Ibid, p. 18, note A.

"Referring to a law that Julius Caesar seems to have engrafted on the low of libel after the death of Sylla, the text has this note: 'Slander, *written or spoken*, against a magistrate, was directed to be punished in a more exemplary manner; but there is reason to believe that punishment was not capital."

Ibid, p. 21:

"Libel is called the most *enlarged form of the abuse of speech.*"

Ibid, p. 23:

"There is not much to be found in the year books and in the ancient reporters with regard to libels, as it was not until the invention of printing that the offense could become common."

"The action of slander, which is the same in principle (i. e., as libel), makes an earlier appearance; but it is to the credit of our national manners that no action for scandalous words appeared to have been brought before the reign of Edward III; and so rare was this action even then that we find one in the whole reign of that prince."

Cooke on Defamation, p. 1, 53 L. L.:

"*Defamation* has been treated in our modern law as of two kinds, *written and oral*. Modern usage has also given to *written defamation the title of libel*, and to oral defamation *that of slander*. The use of the term 'slander' in this restricted sense is not, indeed, etymologically correct, nor is it in accordance with *ancient. authorities;* but the distinction itself is unknown in the old books and abridgements; and it is more convenient to give to written and spoken defamation those arbitrary titles which usage has not fully established."

Bentham on Juries, p. 1.

"Two have actually pleaded guilty to information for *wilfully and maliciously slandering* the British Army, who never, until many days after their publication, *saw or heard of the libel* with which they are charged."

Townshend, Slander & Libel, p. 14.

"Neither judges, advocates nor text writers confine themselves to the terms slander and libel, but employ the terms libel, slander, calumny, defamation, detraction, verbal injury and some others, without any accord as to, and with very little regard for, their definition or connotations. * * * But in using the phrase *"law of libel"* we desire nothing being said to the contrary 'to be understood as meaning and including as well the law applicable to what we call *slander* as to what we call *libel*."

Thorley vs. Lord Kerry, 4 Taunton 355, at 364.

"In this case Lord Mansfield, Ch. J., in his opinion speaks of written and of oral scandal—using scandal as synonymous with slander; and says the distinction has been made between *written* and *spoken* slander as far back as Charles the Second's time."

1 Chitty's Gen'l Prac. 43.

"Injuries to reputations are *written or verbal slander*, and malicious prosecutions imputing the guilt of some disreputable crime. On page 47 the author speaks of *written slander*.

Clement vs. Chivis, 9 B. & C. 174 and 175.

"There is a marked distinction in the books between *oral* and *written* slander." Ibid, 174.

"The distinction between *oral* and *written* slander has also been recognized in Villers vs. Monsley, 2 Wils. 403; 1 B. & P. 331; Bell vs. Stone; Thorley vs. Kerry, 4 Taunt. 355; 4 Bing. 170; Robertson vs. McDougall, 17 R. C. L. Title & Slander, Sec. 2, p. 263.

"The term slander was formerly used to include both libel and slander as the terms are now understood. * * * If it was desired to make any distinction between the two, one was spoken of as *written* slander and the other as *spoken* slander."

36 C. J., pp. 1145 and 1146, Sec. 4.

"The word slander is the general word for all kinds of defamation, and at an *early day* in the history of the *Common Law* the term applied both to oral and written defamation."

Macurda vs. The Globe Newspaper Co., 165 Md. 104, 106.

In this case the judge after a discussion of the use of the word slander used the language:

"It seems, then, that the well-known authorities in the *common law of the last century* used 'slander' as the now general term and sometimes included 'libel' in the general designation of 'slander' or slanderous words.

"A further examination of the language of the writers in the common law shows the phrase 'slanderous words' was sometimes made to apply *to spoken words,* and sometimes to words either *spoken or written. It seems to have generally been assumed that slander may be spoken or written,* and that when written it becomes libel. I think the Legislatures of Maine and Massachusetts in their original statutes and in the subsequent revisions used language with very much the same meaning as that employed by the law writers of a century ago."

Cited in 4 Words and Phrases, title Slanderous Words, fol. 603.

2 Bouvier's Inst. 505, Sec. 2235, "*Injuries to reputation consist in written or verbal slander—written slander.* comes within the definition of libel; *verbal slander*, which is commonly called slander, simply is very different from that which is written, as will be presently seen."

Cooper vs. Greely, 1 Denio. 359, bot. of page.

"Any *written slander*, though merely tending to render the party subject to disgrace, ridicule or contempt, is actionable, though it does not constitute a crime punishable in the temporal courts."

Woodward vs. Dowsing, 2 Mann. and Ryl. at 77.

Lord Tenterden, C. J.

This is a case of *written slander*, in which shape, whatever tends to bring a party into public hatred and disgrace is actionable.

Churchill vs. Hunt, 18 Eng. Com. Law 139, note B, p. 140.

"*Written* slander is in general actionable when it imputes defect in moral virtue."

Feder vs. Herrick, 43 N. J. Law 24 at 26.

"The rule is settled, on grounds of public policy, that the publication of written slander, unlike mere oral defamation, confers a right of action on the person injured though no special damages are proved."

While this question has not been passed on by the Court of Appeals of Maryland, the following cases are persuasive:

In Davis vs. Griffith, 4 G. & J. 343.

The declaration charged the defendant with publishing on May 1, 1925, a card containing a libel. The report starts out as follows: "Appeal from Harford County Court. This was an action on the case for *slander*."

In B. & O. vs. Ritchie, 31 Md. at 198 and 199, decided January 30, 1869, the Court of Appeals, Grason, J., said: "Suits for injuries to the person or character die with the person and can-

not be maintained by the representative of the deceased party. * * *

"These Acts (i. e., these of 1785, Ch. 80, and 1798, Ch. 101, and Ch. 14, Sec. 4) were never intended, however, to prevent the abatement of actions which died with the person."

And thereafter in Clark vs. Carroll, 59 Md. 180, the Court of Appeals (Irving, J.) said:

"In R. R. Co. vs. Ritchie, 31 Md. 198, the Court said: 'Suits for injuries to the person or character, die with the person and cannot be maintained by the representatives of the deceased party.' "

These cases recognize the doctrine referred to in some of the above authorities, that slander and libel are injuries to a man's reputation. Hillard on Torts, 240, supra, and 1 Chitty's General Practice 43, supra.

In support of the contention, that the word slander as used in the Abatement Statutes means oral defamation, to distinguish it from all kinds of defamation, now called libel, and as overcoming the coercive force of the above authorities; plaintiff's counsel cited certain Maryland statutes; pertinent excerpts from which are:

A. *Bagby's Code (1924), folio 1900,* Art. 52, title Justices of the Peace, Sec. 7:

"But no justice of the peace shall have any jurisdiction when the title to land is involved, nor in actions of slander."

B. 2 Bagby's Code (Ibid.), folio 2052, Art. 57; the Limitation Article, Sec. I, of which the important words are:

"*And all actions on the case for words * * * within one year from the time of the cause of action accrued.*"

C. 2 Bagby's Code (Ibid.), folio 2354, Art. 75; title Pleading & Practice, Sec. 19:

"In case any person shall be prosecuted by indictment or any other criminal prosecution *for a libel.*"

D. 2 Bagby's Code (Ibid), folio 2748, title Slander of Females, Art. 88, Secs. 1 to 4, which speaks of slander and actions of slander.

A.

The Act here referred to, is that which prevents actions of slander from being brought before a justice of the peace, even though the amount claimed is one hundred dollars or less.

If the word slander was not used in this Act to mean defamation, the anomalous situation would arise, that while an action for oral defamation, i. e., slander, could not be brought before a justice of peace; an action of libel for all other kinds could; although the Courts for centuries have discouraged bringing of civil actions to recover damages for injuries to reputation; and always have regarded libel as a greater wrong than slander.

B.

The statute here is the Act of 1715, Ch. 23; one of the first, if not the first, limitation act passed in Maryland. It uses the words "Action in the case for words;" if the strict construction is applied for which the plaintiff contends; the limitation would apply to actions based on spoken and written words, and not to one based on a libel by pictures, signs, designs or statutes. Without regard to its meaning the use of the words in this statute could not change the meaning of the word slander in the authorities above quoted.

C.

This is the codification of the Act of 1803, Ch. 54, passed to allow truth to be given in justification of a criminal libel; the sole object of the Act, required the lawmakers to distinguish between oral and written slander. While oral slander is indictable, yet the words to constitute a crime must:

"Directly tend to a breach of the peace; for example, by inciting to a challenge. We must here except words seditious, blasphemous, grossly immoral or uttered to a magistrate while in the execution of his duty." Harris Criminal Law, p. 100 top.

A criminal action of slander is so rare in Maryland that I could not find any reported case, so that the Act is a criminal statute solely directed at libel as distinguished from slander, and the use therein of the word libel does not bear on the meaning of the word slander in the Abatement Statutes (supra).

D.

The statute here referred to is the Act of 1838, Chap. 114, codified as Art. 88, of the Code (supra), title Slander

of Females: Section 1 of which deems "slander" and actionable, all words spoken falsely or maliciously touching the character or reputation for chastity of any woman, married or single.

The second Section of the Act speaks of an action of slander, given to:

"Any woman, whether single or married, whose character or reputation as a woman of chastity may be *traduced or defamed,* may sustain an action of *slander* in her own name against such person."

The language of the various Sections of this Article of the Code shows that the action of slander referred to is that defined by the above "ancient authorities," as oral and written defamation, and not oral defamation alone; if not, while a woman would have an action to recover for damages for words falsely spoken affecting her character or reputation for chastity; she would be without a civil remedy if the same words were printed in a paper of large circulation, or were written and conspicuously posted at a public place.

The rule for the construction of these Abatement Statutes was announced by the Court of Appeals in Gist vs. Cockey, 7 II. & J. 134, at 138, in discussing the Abatement Act of 1785, Ch. 80, supra, in the following language:

"The intention of the Legislature is so clear, their command so positive * * * that this Court *are* bound to give, if necessary, the most extended and liberal construction to this legislative provision to effectuate its object."

Applying this rule to the statutes relied on by the plaintiff, there is nothing in them to show that when the Abatement Statutes were passed, the word slander was not used in its then meaning of defamation and so included libel.

This opinion might well end with the expressive language of Judge Hammon, in a footnote to his very able and scholarly opinion in Warren vs. Furstenheim, 35 Fed. 691:

"It is a curious feature of the subject that, let the legislation be what it may, even to listing or enumerating the kinds of actions that may survive, the Courts apply the old maxim, if possible, and will dig into a dead man's gave to re-enter the wrongs he has suffered or inflicted on others, in spite of the legislative resurrectionists."

The motion will be granted.